**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 1, 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

SYLVESTER J. GRAHAM,

    Defendant - Appellant.

No. 04-8008

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 03-CR-150-B)**

---

Submitted on the Briefs:[*]

Robert R. Rogers, Assistant Federal Public Defender and Raymond P. Moore, Federal Public Defender, Cheyenne, Wyoming, for Defendant-Appellant.

Matthew H. Mead, United States Attorney, David A. Kubichek, Assistant United States Attorney, and Gregory A. Phillips, Assistant United States Attorney, Cheyenne, Wyoming, for Plaintiff-Appellee.

---

Before **SEYMOUR, LUCERO** and **O'BRIEN**, Circuit Judges.

---

[*] After examining the briefs and the appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

**O'BRIEN**, Circuit Judge.

Sylvester J. Graham appeals a 121 month term of imprisonment the district court imposed after he plead guilty to violating 18 U.S.C. § 2423(b) (interstate travel for the purpose of engaging in a sexual act with a person under sixteen years of age).[1] He appeals, arguing the district court misapplied the federal sentencing guidelines and committed clear error in its fact-finding. He also asserts the guidelines are invalid under the Sixth Amendment pursuant to *Blakely v. Washington,* - - U.S. - -, 124 S.Ct. 2531 (2004) (invalidating Washington's sentencing guidelines under the Sixth Amendment).[2] Exercising jurisdiction

---

[1] "A person who travels in interstate commerce . . . for the purpose of engaging in any illicit sexual conduct with another person shall be . . . imprisoned not more than 30 years . . . ." 18 U.S.C. § 2423(b). "[T]he term 'illicit sexual conduct' means (1) a sexual act (as defined in Section 2246) with a person under 18 years of age that would be a violation of chapter 109A . . . ." 18 U.S.C. § 2423(f). "Whoever . . . knowingly engages in a sexual act with another person who - - (1) has attained the age of 12 years but has not attained the age of 16 years; and (2) is at least four years younger than the person so engaging; or who attempts to do so, shall be . . . imprisoned . . . ." 18 U.S.C. § 2243(a). *See also* 18 U.S.C. § 2246(2) (defining "sexual act").

[2] Graham was sentenced on December 30, 2003. After filing his opening brief (May 27, 2004), the United States Supreme Court decided *Blakely* (June 24, 2004). In *Blakely*, the Court applied its decision in *Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.") to invalidate Washington's sentencing guidelines under the Sixth Amendment. In *Blakely*, the

under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we AFFIRM.

### *Background*

On May 23, 2003, during an online sting operation conducted by the Wyoming Department of Criminal Investigation (DCI), Graham, then fifty-seven years of age and believing he was conversing in a chat room with the mother of a twelve-year-old girl, agreed to travel from Phoenixville, Pennsylvania, to Cheyenne, Wyoming, to engage in sexual relations with both the mother and her daughter.[3]  As Graham admitted when he entered his plea of guilty:

> After my wife died I was starting to visit some chat rooms online and was into adult chat rooms, had a fetish with chat rooms.  I was - - I was in there and I met someone, a woman with a child.  And after talking for several weeks we agreed that I would come here to have sex with her and her daughter.

---

sentencing court enhanced a standard sentence under these guidelines.  The facts necessary to support the enhancement were neither admitted by the defendant nor proven to a jury beyond a reasonable doubt.  Even though the enhanced sentence did not exceed the statutory ceiling of imprisonment for the offense, the Court invalidated it.  *Blakely,* 124 S.Ct. at 2538.  In doing so, the Court clarified that "the statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."  *Id.* at 2537 (quotation marks and emphasis omitted).

We permitted supplemental briefing to enable Graham to develop his *Blakely* claim.  After supplemental briefing was concluded, the Supreme Court decided *United States v. Booker*, - - U.S. - -, 125 S.Ct. 738 (2005), in which it extended its ruling in *Blakely* to invalidate the federal sentencing guidelines insofar as they were mandatory.  125 S.Ct. at 746.  We apply both *Blakely* and *Booker* to this appeal.

[3] The sting operation included five different chat room conversations between the DCI agent and Graham in May 2003.

(R. Vol. Three at 7.)

The Presentence Investigation Report (PIR), prepared in aid of sentencing, included a prosecutor's statement detailing the offense. According to this statement, the DCI agent involved in the sting operation leading to Graham's arrest posed as the mother of not just one, but two daughters, ages seven and twelve. Because resolution of the issues presented on appeal depends in large part on the factual allegations contained in the prosecutor's statement, we quote it at length:

> On May 9, 2003, Special Agent Robert Leasenby, of the Division of Criminal Investigation (DCI) Computer Crime Unit, acting as 'ibalissasmom' was in the internet chat room 'PRETEN Parents who share [2}:1' when he was contacted by 'master_heart_of_evil.' Identifying himself as '53/m,' 'master_heart_of_evil' asked 'how old are your little ones' and was told ages 7 and 12. He responded, 'that is great, so curious, willing to please.' He laments that 'it gets harder to find moms and daughters. It is a little dangerous.' He states that he 'actually met two at a single parents group' and 'two on here, but that was a while ago' and 'before the rooms got crowded.' In response to the question whether he had actually gotten together, he says 'yes.' He states that he is 'lucky enough to be able to travel most weekends,' not for work but 'just for me.' He says that he lives in Pennsylvania, near 'Philly.'
>
> Then 'master_heart_of_evil' gets down to business. He asks 'ibalissasmom' 'how long have you been active with yours.' He is told about two years with the older but not with the younger. When asked what he prefers, 'master_heart_of_evil' says 'I don't put a younger limit lol.' He then adds that 'I have been with as young as 6. Mom wanted her broken and taken roughly.' He then spoke of 'one mom who had an 11 and 13 who were both very experienced,' and adds 'that was fun too.' Then comes the solicitation. He asks 'have you thought about them being with a man yet.' In response to

-4-

that 'ibalissasmom' tell her daughter that 'someone is coming to see her as a date.'  He offers to let her see him on camera first.  He suggests that the daughter sit next to him in the restaurant, 'just like a date.'  He promises to bring flowers and upon being told she likes bears, he says 'ok, a stuffed bear and some flowers.'  In response to being told 'man you are a gentleman,' 'master_heart_of_evil' announces 'I love kids.'

He describes a sexual relationship with a daughter now aged 22 years.  Then 'master_heart_of_evil' inquires as to the name of the Cheyenne airport and asks about nearby hotels.  Upon being told the nicest is Little America, he declares 'little america it is then.'  Upon being asked, he states that he is a support manager for a software company.  He promises to 'make up any salary you miss.'  He suggests looking at 'weekend after next then and see what happens.'  He says that he will fly from Philly to Denver and then to Cheyenne.  He mentions another screen name he uses and says that it has the same picture he had sent to 'ibalissasmom' earlier in the conversation.  He mentions that 'we can probably meet in the lobby since you know what I look like lol.'  He promises to reimburse her for getting Friday and Saturday off if she can.  He says, 'I have a good feeling about this.'  So ends the first conversation.

On May 14, 2003, 'master_heart_of_evil' again contacts 'ibalissasmom' and asks 'are you ready for my visit?'  He says that 'I will have that Friday off so I will get to the hotel earl[y] on Friday.'  He then adds that 'oh, I am Sly (sylvester).'  He declines a ride upon arriving in Cheyenne, saying that he 'will get a shuttle to the hotel' as it will be 'probably easier to meet you there after I get checked in and all.'  He says he will 'make the flight reservations tonight.  I already have a room at the hotel.'  He says that he will have 'flowers for alissa' and will 'have to find a teddy bear and a small unicorn.'  Inquiring into the 'little ones name,' he is told 'Sarah' and says that she can order what she wants from room service too.  He tries to arrange a telephone call to talk to Alissa.  He gives his home telephone number and his cell number.

On May 15, 2003, 'master_heart_of_evil' contacts 'ibalissasmom' again to inform her that 'reservations are all made for next week.'  He says that he will arrive in Cheyenne about 4:30 on Friday and

should get to the hotel around 6 p.m.  He says that 'this is for you also dear and I will make up any pay that you are missing.'  On May 20, 2003, 'master_heart_of_evil' confirms that he will arrive on Friday at 4:30 and suggests meeting at the hotel rather than the Cheyenne airport.  On May 21, 2003, 'master_heart_of_evil' leaves a short message saying that 'I am trying to find a nice teddy bear for my date.  I will look for you today sometime.'

(R. Vol. Five at 4-6.)

Upon his arrival at the Cheyenne, Wyoming airport, Graham is arrested. During a consensual search of his luggage , authorities discovered two gift bags (one with a flower design, one with a balloon design, each containing a stuffed animal), two bottles of Viagra (an erectile dysfunction medication), a bottle of sexual lubricant, a black suede flogger, and two prosthetic penises.  Later, the Phoenixville Borough Police Department searched Graham's computer in Pennsylvania and discovered numerous pornographic images (still and moving) of prepubescent children and infants.

Reasoning that Graham had a purpose to engage in a sexual act with a person under twelve years of age (the virtual seven-year-old) and applying the cross reference to USSG §2A3.1 contained in §2A3.2(c),[4] the PIR calculated a

---

[4] The purpose to engage in a sexual act with a person under twelve years of age (the virtual seven-year-old) is material to the guideline calculation as relevant conduct.  *See* USSG §1B1.3; USSG § 1B1.1, comment. (n.1(H)) (the term "offense," as used in the guidelines, "means the offense of conviction and all relevant conduct under § 1B1.3 . . . .").

base offense level of 27. *See* USSG §2A3.2(a)(2) (providing for a base offense level of 21); USSG §2A3.2(c) (cross reference to §2A3.1 under specified conditions); USSG §2A3.1(a) (providing for a base offense level of 27). The PIR enhanced the base offense level by four under USSG §2A3.1(b)(2)(A) (victim is less than twelve years of age) and two under USSG §2A3.1(b)(6) (use of a computer or Internet-access device to facilitate travel by a participant). These enhancements resulted in an adjusted offense level of 33. The PIR applied a downward adjustment of three levels for acceptance of responsibility, s*ee* USSG §3E1.1(a) and (b), resulting in a total offense level of 30. With a criminal history category of I, the recommended guideline range was 97 to 121 months imprisonment. At sentencing on December 30, 2003, the court adopted the PIR's calculation and sentenced Graham to 121 months imprisonment, the high end of the range.[5]

On appeal, Graham challenges the district court's legal decision to engage the cross reference in USSG §2A3.2(c) (requiring application of USSG §2A3.1) and to enhance four levels under USSG §2A3.1(b)(2)(A) (providing an enhancement of four levels if the victim is less than twelve years of age). He also challenges the court's finding of fact that Graham intended to engage in a sexual

---

[5] The court utilized United States Sentencing Commission, *Guidelines Manual* (Nov. 2003). *See* 18 U.S.C. § 3553(a)(4)(A)(ii) (requiring application of guidelines in effect on date of sentencing).

act with a person under twelve years of age. Finally, he challenges the constitutionality of the guidelines after *Blakely*. We take up his arguments *ad seriatim*.

### *Discussion*

### *A.      Application of the Guidelines*

"When reviewing a district court's application of the Sentencing Guidelines, we review legal questions *de novo* and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Doe,* 398 F.3d 1254, 1257 (10th Cir. 2005) (internal quotation marks omitted). "A finding of fact is clearly erroneous if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made." *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000) (internal quotation marks omitted). Furthermore, notwithstanding *Booker's* invalidation of the mandatory nature of the sentencing guidelines, *see* 125 S.Ct. at 745, "district courts must still consult the Guidelines and take them into account when sentencing. Thus, appellate review continues to encompass review of the district court's interpretation and application of the Guidelines." *Doe,* 398 F.3d at 1257 n.5 (internal quotation marks and citation omitted) (reviewing a pre-*Booker* sentence). *See also United States v. Souser,*

405 F.3d 1162, 1165 (10th Cir. 2005) (accord).

We begin with an overview of the guidelines in question. Sentencing for a violation of 18 U.S.C. § 2423(b) is governed by, *inter alia*, USSG §§2A3.1 and 2A3.2.[6] *See* USSG App. A. Section 2A3.2(a)(2) provides for a base offense level of 21 where, as here, the offense did not involve the actual commission of a sexual act or actual sexual contact. However, application of the guideline is subject to the following cross reference:

> If the offense involved criminal sexual abuse or attempt to commit criminal sexual abuse (as defined in 18 U.S.C. § 2241 or § 2242), apply § 2A3.1 (Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse). If the victim had not attained the age of 12 years, § 2A3.1 shall apply, regardless of the 'consent' of the victim.

USSG §2A3.2(c)(1). Section 2A3.1 provides a more severe base offense level of 27. *See* USSG §2A3.1(a). For purposes of its application, §2A3.2 defines "victim" to mean "(A) an individual who, except as provided in subdivision (B), had not attained the age of 16 years; or (B) an undercover law enforcement officer who represented to a participant that the officer had not attained the age of 16 years." USSG §2A3.2, comment. (n.1). Focusing on the second sentence of the cross reference in §2A3.2(c)(1), Graham contends that because "victim" is defined to include only a person under sixteen years of age or an undercover law

---

[6] Sentencing for a violation of 18 U.S.C. § 2423(b) is also governed by USSG §2A3.3 (applicable to wards and therefore not relevant to this appeal).

enforcement officer only when posing as a person under sixteen years of age and, in his case, the undercover law enforcement officer posed as the mother of two persons under sixteen years of age, the cross reference does not apply. We disagree.

Prior to November 1, 2000, the cross reference in §2A3.2(c)[7] did not contain the second sentence (referencing "victim") to which Graham hitches his claim. It plainly required then, as it does now, that "[i]f the offense involved criminal sexual abuse," §2A3.1 must be applied instead of § 2A3.2. Assuming the district court did not clearly err in its factual finding that Graham intended to engage in a sexual act with a seven-year-old child, a point which we take up shortly, Graham's offense, without doubt, "involved criminal sexual abuse." *See* 18 U.S.C. § 2241(c) ("Whoever crosses a state line with intent to engage in a sexual act with a person who has not attained the age of 12 years . . . shall be . . . imprisoned for any term of years or life . . . ."). The question then becomes whether application of the first sentence of the cross reference (mandating the application of § 2.3A1) depends upon fulfillment of the definition

---

[7] The cross reference contained in §2A3.2(c) was added to the guideline by an amendment effective November 1, 1992. *See* USSG App. C, Vol. I, Amendment 444 at 319, 324. The United States Sentencing Commission offered the following reason for the amendment: "A review of cases . . . indicated that a significant proportion of cases sentenced under § 2A3.2 . . . clearly involved conduct that would more appropriately be covered under an offense guideline applicable to more serious sexual abuse cases." *Id.* at 320.

of "victim" in its second sentence. In other words, we inquire whether the second sentence qualifies or merely clarifies the first. "We interpret the Sentencing Guidelines according to accepted rules of statutory construction. In interpreting a guideline, we look at the language in the guideline itself, as well as at the interpretative and explanatory commentary to the guideline provided by the Sentencing Commission." *United States v. Robertson,* 350 F.3d 1109, 1112 (10th Cir. 2003), *cert. denied,* 541 U.S. 1052 (2004) (internal quotation marks and citation omitted). When the cross reference was amended to add the second sentence, effective November 1, 2000, the United States Sentencing Commission offered the following explanation:

> The amendment also *clarifies* that, in §[]2A3.2(c)(1) . . ., the cross reference to § 2A3.1 shall apply if the offense involved criminal sexual abuse of a minor under the age of 12 years, regardless of the 'consent' of the victim. *Review of Commission data indicated that the cross reference to § 2A3.1 currently is not being applied in many cases in which the offense conduct suggests it should.*

USSG App. C, Vol. II, Amendment 592 at 49 (emphasis added). From this explanation, it is manifest the second sentence is only intended to clarify that the cross reference is operative under the conditions stated in its first sentence irrespective of the consent of a victim under twelve years of age. The addition of the second sentence to the cross reference neither added to nor subtracted from the pre-existing operative effect of the cross reference contained in the first sentence. The second sentence has no independent operative effect of its own.

-12-

We add the second sentence is immaterial in any event inasmuch as there is no evidence the virtual children in this case consented to their own intended sexual abuse.[8]

Next, Graham contends that even if the district court correctly applied § 2A3.2's cross reference to § 2A3.1, it erred in enhancing under § 2A3.1(b)(2)(A) (enhance four levels "[i]f the victim had not attained the age of twelve years") because there was no actual victim, only a virtual one.[9] However, we have previously observed that online sting operations to identify and capture sexual predators fulfill the intent of the guidelines. "[T]he 1998 Act [Child Protection and Sexual Predator Punishment Act of 1998, Pub.L. No. 105-314, 112 Stat. 2974] . . . directed the Sentencing Commission to impose harsher penalties on

---

[8] As to the merit of Graham's argument that an undercover law enforcement officer posing as the mother of two children under sixteen years of age is not a "victim" as defined in the commentary to the guideline, see USSG § 2A3.2, comment. (n.1), we believe Graham too tightly constrains the definition. We discern no material difference between an undercover law enforcement officer who represents himself to be the mother of two daughters under sixteen years of age and one who represents himself to be under sixteen years of age. In each instance, the undercover law enforcement officer is offering an opportunity to a sexual predator to engage in a sexual act with a person under sixteen years of age. Whether the law enforcement officer is speaking as a child or as a mother with supervisory control of a child does not disturb the intent of the guidelines to countenance undercover sting operations and punish sexual predation of children less than sixteen years of age.

[9] Unlike § 2A3.2, § 2A3.1 contains no definition of "victim." Interestingly, amended § 2A3.1, effective November 1, 2004, defines "victim" to include "an undercover law enforcement officer." See USSG § 2A3.1, comment. (n.1) (Nov. 2004).

sexual criminals who used computers." *Robertson,* 350 F.3d at 1114. "In interpreting its instructions from Congress, the Sentencing Commission concluded that . . . new enhancements were to ensure that persons who . . . use computers or Internet-access devices to locate and gain access to a minor, are severely punished." *Id.* (internal quotation marks omitted).

> Law enforcement has responded to the new threat of cyber-predators by setting up sting operations and enforcing the increased penalties now available under the Guidelines. If a would-be predator cannot know whether the person with whom he communicates is an undercover agent rather than a susceptible minor or a pimp, and if the penalties for using the computer medium are especially severe, the hope is that pedophilic predators will cease to find cyberspace such a safe and attractive hunting ground.

*Id.* "[T]he targets of sting operations are not relieved of criminal liability merely because their intended victim turned out to be an undercover agent and not a child." *Id.* at 1118 n.2. *See also United States v. Lebovitz,* 401 F.3d 1263, 1268 (11th Cir. 2005) ("[W]hether a victim is fictitious is irrelevant to the application of a federal statute or sentencing guideline prohibiting sexual conduct with a minor."); *United States v. Butler,* 92 F.3d 960, 963 (9th Cir. 1996) (in response to argument that §2A3.2 should apply instead of §2A3.1 because the three victims were virtual, the court stated "the fact that Appellant was unable to complete the crime because the victims were fictitious is not the determining factor. Rather, Appellant's intent and conduct constitute attempted criminal sexual abuse of three young children."). Since the law permits virtual victims under these

circumstances, Graham's claim fails.

Finally, Graham contends the district court clearly erred in finding he intended to engage in a sexual act with a person under the age of twelve years (the virtual seven-year-old). This finding was essential to the court's cross-reference to §2A3.1 under §2A3.2(c) and to its enhancement under §2A3.1(b)(2)(A). Graham complains that the prosecutor's statement, recounting at length his chats with the DCI agent, was unsworn.[10] He adds that, post-arrest, he vigorously denied an intention to engage in a sexual act with a seven-year-old.

We first note that Graham, at sentencing, did not dispute the prosecutor's statement (incorporated into the PIR) on the ground its alleged verbatim record of his chats with the DCI agent was inaccurate.[11] Quite the opposite, he admitted to the accuracy of the record.[12] He characterized his remarks this way: "[Y]ou get to

_____

[10] We decline to consider this claim, as it was not raised in the district court. *Walker v. Mather (In re Walker),* 959 F.2d 894, 896 (10th Cir. 1992). In any event, the Federal Rules of Evidence are not applicable to sentencing proceedings. FED. R. EVID. 1101(d)(3).

[11] Inasmuch as Graham admitted to the accuracy of the record of his chat room conversations, we need not consider the default provision of FED. R. CRIM. P. 32(i)(3)(A) ("At sentencing, the court: (A) may accept any undisputed portion of the presentence report as a finding of fact[.]"). *See also United States v. Dennino,* 29 F.3d 572, 580 (10th Cir. 1994) ("Failure to object to a fact in a presentence report, or failure to object at the hearing, acts as an admission of fact.").

[12] We do not mean to imply Graham admitted to the accuracy of the editorial flourishes included in the prosecutor's statement. We only conclude he admitted to the accuracy of the record of his conversations with the undercover

talking in these [chat] rooms and it's like things aren't real there.  Almost

becomes surreal.  You hear something, you say something, they make something

up, you say something else and I'm not sure . . . ."  (*Id.* at 22.)  He added:

> I read through those things, and looking at some of those things that
> are said, I don't remember saying.  I looked at a transcript of those
> chats - - I mean, I guess you're in there, you just - - you can talk
> about all kinds of things, and I do, I did - - I admit, you know, being
> there and things I said and things I intend to do, but, again, I didn't
> really have - - you don't even put people with it.

(*Id.* at 23.)  In other words, Graham only objected to the record on the ground he

did not really mean what he said, maintaining his remarks were "role-playing and

fantasy-based."  (R. Vol. Five Addendum at 1.)  Graham's counsel expanded on

this defense, arguing Graham "never intended that the 7-year-old be a victim.

This is notwithstanding things he said in his chat, because Mr. Graham will testify

that the things he said in his chat involved, in large part, role playing and fantasy

and make believe things."  (R. Vol. Four at 8.)  Therefore, like Graham, his

counsel conceded the accuracy of the record of Graham's chats and merely sought

to explain it.

After careful consideration of the vile chat room remarks attributed to

Graham in the prosecutor's statement (the incriminatory nature of which is self-

evident and which we decline to repeat in order to spare the sensibilities of the

---

DCI agent.

reader), Graham's explanation of his remarks, and the fact that Graham traveled from Pennsylvania to Wyoming with two gift bags (each containing a stuffed animal) and other sexual paraphernalia in hand, leaving behind in Pennsylvania his computer laden with numerous pornographic images (still and moving) of prepubescent children and infants, we conclude without difficulty that the district court did not clearly err in finding Graham intended to engage in a sexual act with a seven-year-old child.

## B. *Blakely Challenge*

In *United States v. Booker,* - - U.S. - -, 125 S.Ct. 738 (2005), the Court extended its ruling in *Blakely* to invalidate the federal sentencing guidelines insofar as they were mandatory. 125 S.Ct. at 745. The Court held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at 756. The Court concluded the guidelines would not offend the Constitution if advisory only. *Id.* at 749-50. To this end, in the remedial portion of its opinion, the Court excised those provisions mandating application of the guidelines. *Id.* at 756-57. The Court indicated its decision was applicable to all cases, like this one, on direct review. *Id.* at 769.

Applying *Booker,* we have stated:

[T]here are two distinct types of error that a court sentencing prior to *Booker* could make. First, a court could err by relying upon judge-found facts, other than those of prior convictions, to enhance a defendant's sentence mandatorily. As *Booker* makes clear, the Sixth Amendment prohibits this practice. As a matter of convenience, we will refer to such an error as a constitutional *Booker* error. Second, a sentencing court could err by applying the Guidelines in a mandatory fashion, as opposed to a discretionary fashion, even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction. While this type of sentence does not violate the Sixth Amendment, such a sentence is nonetheless impermissible because the Court severed the portion of the Sentencing Reform Act that required the mandatory application of the Guidelines. We will refer to this second type of error as a non-constitutional *Booker* error.

*United States v. Gonzalez-Huerta,* 403 F.3d 727, 731-32 (10th Cir. 2005) (en banc) (quotation marks and citations omitted). Irrespective of the type of error involved, *Booker* does not necessitate a remand for resentencing in all instances. Instead, "reviewing courts [are] to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the plain-error test." *Booker,* 125 S.Ct. at 769 (quotation marks omitted).

In this case, the district court, implicitly if not explicitly, found the facts necessary to support three separate enhancements: an enhancement of six levels occasioned by the cross reference from §2A3.2 to §2A3.1; an enhancement of four levels under USSG §2A3.1(b)(2)(A) (victim is less than twelve years of age) and an enhancement of two levels under USSG §2A3.1(b)(6) (use of a computer or Internet-access device to facilitate travel by a participant). On appeal, Graham

challenges the constitutional basis of only the first two of these enhancements. To support each of these enhancements, the court found Graham had the intention to engage in a sexual act with a seven-year-old child. Inasmuch as this amounts to judicial fact-finding, it is constitutional *Booker* error. However, since the error was not preserved below, we review only for plain error.

"Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Gonzalez-Huerta,* 403 F.3d at 732 (internal quotation marks omitted). "We conduct this analysis less rigidly when reviewing a potential constitutional error." *United States v. Dazey,* 403 F.3d 1147, 1174 (10th Cir. 2005) (internal quotation marks omitted). On the other hand, we enjoy discretion to notice plain error. *See* FED. R. CRIM. P. 52(b). In this case, there is no doubt the error is plain, and as a result, the first two prongs of the plain error test are satisfied. *See United States v. Clifton,* 406 F.3d 1173, 1181 (10th Cir. 2005) ("Non-constitutional and constitutional *Booker* errors satisfy the first two prongs of the plain-error test."). We thus limit our review to the third and, if necessary, the fourth prong of the plain error test.

"Satisfying the third prong of plain-error review--that the error affects substantial rights--usually means that the error must have affected the outcome of the district court proceedings." *Gonzalez-Huerta,* 403 F.3d at 732 (internal

quotation marks omitted).  It is the defendant's burden to make this showing, even

in a case of alleged constitutional error.  *Id.* at 733.  "To meet this burden, the

appellant must show a reasonable probability that, but for the error claimed, the

result of the proceeding would have been different."  *Id.* (internal quotation marks

omitted).

> In a case of constitutional *Booker* error, there are at least two ways a
> defendant can make this showing. First, if the defendant shows a
> reasonable probability that a jury applying a reasonable doubt standard
> would not have found the same material facts that a judge found by a
> preponderance of the evidence, then the defendant successfully
> demonstrates that the error below affected his substantial rights. This
> inquiry requires the appellate court to review the evidence submitted at
> the sentencing hearing and the factual basis for any objection the
> defendant may have made to the facts on which the sentence was
> predicated. Second, a defendant may show that the district court's error
> affected his substantial rights by demonstrating a reasonable probability
> that, under the specific facts of his case as analyzed under the
> sentencing factors of 18 U.S.C. § 3553(a), the district court judge would
> reasonably impose a sentence outside the Guidelines range.

*Dazey,* 403 F.3d at 1175 (footnotes omitted).

We first inquire whether there is a reasonable probability a jury, applying a

beyond a reasonable doubt standard, would not have found, as did the court

applying a preponderance of the evidence standard, that Graham intended to

engage in a sexual act with a seven-year-old child.  To answer in the negative, we

need only point to the evidence upon which we relied in Subsection A (finding no

clear error in district court's fact-finding).  This is not even a close call.  The

evidence of Graham's criminal intention to engage in a sexual act with a seven-

year-old child is overwhelming, barely diminished by Graham's weak explanations. There is little probability a jury would have found differently than did the court.

Nor has Graham met his burden to demonstrate a reasonable probability that, under the specific facts of his case as analyzed under the sentencing factors of 18 U.S.C. § 3553(a),[13] the district court would have reasonably imposed a

---

[13] **Factors to be considered in imposing sentence**. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

sentence outside the guideline range under a post-*Booker* advisory regime. The court's comments in declaring sentence clearly evidence the contrary:

> You appear to be a very ordinary person. And yet your actions in this particular case are indeed very, very evil. You came with the wrong intent and I think that your attempt at sexual acts with these two alleged minor children are supported by the graphic details of other sexual encounters that you had with children. And the fact that you, within a month, made the travel arrangements to meet them here in Cheyenne and brought them gifts and other sexual paraphernalia leads me to believe that this wasn't the first - - wasn't the only time.
>
> I think that, in short, what I'm saying, sir, is that I believe you're a predator, and I not only believe that, but I also think that you're a liar. I don't think that you've told us the truth, or at least not the whole truth. And on that ground, I think that I have to protect

---

(3)   the kinds of sentences available;

(4)   the kinds of sentence and the sentencing range established for –

    (A)   the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .

(5)   any pertinent policy statement –

    (A)   issued by the Sentencing Commission . . . .

(6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)   the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

society here and I'm going to do that by giving you the maximum sentence. I think that's got to be done.

. . . .

I strongly recommend that the Bureau of Prisons shall offer you a sex offender treatment program at the FCI Butner Institution in Butner . . . North Carolina, and I've recommended that several times in the past and we've never gotten it, but I'm not giving up. I think that in your case, it may be very, very useful, because I cannot help but regard your case as a very, very egregious case.

And as I've said, I think you're a predator and I think that society has got to be protected from you. You're committed to the custody of the marshal.

(R. Vol. Four at 26-27, 31.) After its comments, the court sentenced at the top of the guideline range. We identify nothing in the record or in Graham's argument to counterbalance the court's comments or to suggest it would have sentenced differently in the absence of the provision mandating application of the guidelines. If anything, the court's comments suggest it might have imposed a more lengthy sentence if not constrained by the guidelines.

Therefore, we conclude judicial fact-finding of Graham's intention to engage in a sexual act with a seven-year-old child did not affect Graham's substantial rights under the third prong of the plain error test. This being so, we need not consider whether he satisfies the fourth prong of the test. We determine Graham has failed to satisfy the plain error test for constitutional *Booker* error.

-23-

*Conclusion*

Accordingly, we AFFIRM the judgment of the district court.